## In the Estate of Gen. William H. Blair, deceased. Appeal of Frank P. Blair.

*Equity—Specific performance—Vendor and vendee—Interest on purchase money—Costs.*

B. and his son owned two hundred and sixty acres of land. In 1887 B. agreed in writing to sell the whole two hundred and sixty acres to F., a corporation, for the sum of $5,200. F. took possession of the land and proceeded to take from it ore and timber. B. died in 1888 leaving his son as his only heir. The son became administrator of his father's estate. In 1889 the son brought an action of ejectment against F., and secured a verdict in May, 1891. Judgment on the verdict was suspended until F. should begin proceedings for specific performance in the orphans' court. It was ordered that F. should commence such proceedings within sixty days, and prosecute them to final hearing within six months, unless the time was enlarged. F. ignored the order, and did not file a petition for specific performance until more than twenty-five months after the time allowed for filing it had expired. A master was appointed by the orphans' court, and his findings, approved by the court, were, in effect, that B.'s son was able to carry out the contract made by B. The court accordingly entered a decree that B.'s son should within thirty days deliver a deed of the land to F. It was also decreed that if it was impossible for the estate to make the deed within the time designated, the case should be referred back to the master to ascertain the exact quantity of land B. had title to, and the due proportion of the purchase money, without interest, which should be paid on such part. F. appealed from this decree, but the appeal was quashed on the ground that the decree was not final. The deed by F. was not filed within thirty days from the decree, but it was subsequently executed and presented to the master. The court below held that the deed for the whole tract was not tendered in time, and entered a decree requiring B.'s son as administrator to convey only the land which his father owned at the time of his death. *Held*, (1) that the final decree was erroneous; (2) that the court should have allowed the deed filed after the expiration of thirty days the effect which it would have been

entitled to if it had been filed within the time named in the preliminary decree; (3) that interest should have been allowed upon the purchase money from the date of the contract; (4) that the costs should be equally divided between the parties.

Argued April 24, 1896.    Appeal, No. 323, Jan. T., 1896, by Frank P. Blair, from decree of O. C. Centre Co., on petition for specific performance.    Before STERRETT, C. J., McCOLLUM, MITCHELL, DEAN and FELL, JJ.    Reversed.

Petition for specific performance.    From the record it appeared that various orders and decrees were made from time to time by different judges.

The facts are briefly as follows: On August 18, 1887, General William H. Blair, the decedent, gave to the Bellefonte Furnace Company, the petitioners, in writing, the refusal or option, for the ·period of sixty days, to purchase from him a tract of land situate in Half Moon township, Centre county, Pa., containing 260 acres or thereabouts, for the sum of $5,200, with a provision. therein to the effect that whenever the purchasers, by the sale of the surface of said land, iron ore or timber thereon, should be reimbursed the said sum of $5,200, then he should become the owner of an undivided one half interest in what remained unsold; his interest in the iron ore to be accounted for at twelve and one half cents per gross ton as royalty; the furnace company to have the right of entry, within the sixty days, for the purpose of testing for iron ore thereon.    In pursuance of this contract the furnace company went into possession, sank certain test pits for ore and made valuable improve‑ ments upon said land, and while there was no specific election on the part of the furnace company to accept the land under the option, the parties acted as if it had been accepted and dealt with each other upon that basis.    No legal tender was ever made of the purchase money, but the purchasers signified to Mr. Blair, their readiness, and offered to pay the purchase money upon title being made in pursuance of the contract, desiring to have the title in order to place upon this and their other property a contemplated mortgage for one hundred thousand dollars. The evidence shows that while Mr. Blair treated this tract of

land as his own, that the title to a part thereof, to wit: That portion included within the lines of the Josiah Lambourne survey, was in his son, Frank P. Blair, who is his administrator and the respondent in this proceeding, and the title to another portion thereof was in William Lytle, to whom he had sold it by article of agreement; that he had an understanding with his son to join in a conveyance, and with said Lytle for his title, if necessary, but objected to passing the title on account of the intention of the furnace company of including the premises in the mortgage, on the theory that the mortgage would interfere with his reserved rights in the property.   Mr. Blair died in 1888, intestate, leaving to survive him, his widow and one son, the said Frank P. Blair, thus vesting in said Frank P. Blair the legal title to the land agreed to be conveyed to the furnace company, subject only to the right of dower therein in the decedent's widow.

On the 16th of April, 1889, Frank P. Blair brought an action of ejectment against the furnace company, to No. 319, April term, 1889, in the court of common pleas, of Centre county, for the 260 acres of land in question.   The case was tried May 5, 1891, when the defendants, by way of defense, claimed title under the option contract, the offer of which was objected to and excluded by the court on the ground that the orphans' court alone had jurisdiction over such contracts and a verdict was taken for the plaintiff.   On the 6th of May, 1891, a rule for new trial was granted, which, on the 24th of July, 1893, was overruled by Judges FURST of the 47th, and BARKER of the 49th judicial districts, before whom it was heard, who made decree, allowing defendants sixty days within which to institute proceeding for specific performance in the orphans' court, and provided that no judgment be entered upon the verdict, except upon application to the court.   On the 26th of August, 1893, the Bellefonte Furnace Company filed in the orphans' court of Centre county their petition for specific performance of said contract, to which petition, respondent made answer to the effect that the contract in question was a mere option for sixty days, not accepted, nor purchase money paid or tendered, and denying petitioners' right to specific performance.   At the same time the respondent, as an individual, represented, that while under no obligation, either as an individual or adminis-

trator to do so, he was willing to convey said land to the peti-
tioners, including the part owned by him individually, as well
as that inherited from his father, upon their paying the stipu-
lated price of $5,200, with interest. On the 27th of November,
1893, Clement Dale, Esq., was appointed examiner and master
to report the facts to the court, and to suggest a decree, who
made report the 6th of December, 1894, finding from the facts
that the land agreed to be conveyed by the option contract con-
tained 270 acres 113 perches; that the title to about one half
of this land was vested in the decedent and the other one half
in his son, Frank P. Blair; that prior to the making of the
option contract, the decedent had sold to one William Lytle
132 acres of the land in question; that subsequent to his death
a release had been procured from said William Lytle to said
Frank P. Blair, vesting title in him; and that he, the said Frank
P. Blair, could, as he proposed in his answer to the petition
and in his testimony, make title to the entire tract, and he
recommended a decree that as an individual, and as adminis-
trator and sole heir at law of his father, he make deed, therefor,
to the Bellefonte Furnace Company, reserving such rights as
were contemplated in the option contract, and that the furnace
company, within ten days from the receipt of notice of the
preparation of said deed, pay to him the sum of $5,200, with-
out interest, the costs to be equally divided between them.
Exceptions were filed to this report before the master, which
were overruled by him, and the same were subsequently renewed
in court; they alleged various errors of law and fact made by
the master. The exceptions were argued on the 4th of Janu-
ary, 1895, before the then president judge of the court, the
Honorable A. O. FURST, who filed an opinion thereon, in which
he briefly considered the rights and equities of the parties,
and in favor of the petitioners held that the facts, as to the offer
of payment of the purchase money, under the circumstances,
were equivalent to a tender thereof, and considering the condi-
tion of the title, that the purchaser ought not to be required to
pay interest upon the purchase money; and decided in favor of
the estate, by allowing it to have the benefit of securing title
from William Lytle and Frank P. Blair, so as to enable the con-
veyance to be made of the entire tract agreed to be conveyed
under the option contract, and in accordance with said option

the court on the 5th of January, 1895, made decree as follows, namely : " Decree. And now, January 5, 1895, the above cause came on to be heard upon exceptions to the master's report and the same was duly argued by counsel, and after consideration thereof, the court do award and decree specific performances of said contract of August 17, 1887, in manner following :

" 1. The estate of Gen. W. H. Blair is allowed thirty days from this day to obtain a good and sufficient title to all of the land therein described, and thereupon shall, within said period, prepare and file in the orphans' court a good and sufficient deed conveying to the petitioners a fee simple clear of all encumbrances, a good and sufficient title to the lands in said contract mentioned and being specifically described by metes and bounds in the decree submitted by the master, subject only to the reservation contained in said written contract, and upon notice of the filing thereof, petitioners shall thereupon pay into the orphans' court and subject to the order of the court, without liability to costs or poundage, the sum of $5,200, and thereupon the said court shall name and file a formal decree in specific performance of said contract according to the true intent and meaning thereof.

" 2. If, within said time, it shall be impossible (by reason of inability to obtain) for the estate of Gen. W. H. Blair to make such conveyance of title as is provided in the first section of this decree, the petitioners having, in open court, assented to an election and willingness to take title to such part as Gen. W. H. Blair had title at the date of the agreement, then the case to be referred back to the master to ascertain the exact quantity of land to which the estate of Gen. W. H. Blair had title at the date of contract and at the time of his death. Also to ascertain the due proportion of the purchase money, without interest, which should be paid for such part. Said calculation to be made upon the basis of $5,200 for the net amount of land contained and described with the boundaries set out in the aforesaid agreement, and to report the same to the court within thirty days after the reference back to the master, and the court, shall thereupon make a formal decree in specific performance of the contract so far as the same can be specifically enforced, as aforesaid, reserving to the grantee or grantees in said contract any right of action he or they may have at law or in equity for breach of contract as aforesaid.

. "3. All costs now accrued to be paid by the parties in equal proportion as decreed by the master, including the master's fee of $100. All future costs which may be incurred to be paid by the estate of Gen. W. H. Blair.

"4. The purchase money, when paid into the orphans' court, shall be paid out upon the written order of the court only, or shall be retained by the court until the equities arising out of this contract shall be fully adjusted by the decree of the said court."

This decree, as will be seen, was so drawn as to enable the administrator, who is the sole heir of the decedent, to procure the outstanding title of William Lytle and, as administrator and an individual, file deed for the entire tract of land, and gave him thirty days therefrom to do so, in which case the petitioner should pay into court the consideration or sum of $5,200, without interest, in which case a formal decree in specific performance of contract should thereupon be made. And it further provided that, in case it was "impossible by reason of inability to obtain title" for the administrator to thus convey, that then the case "be referred back to the master to ascertain the exact quantity of land to which the estate of Gen. W. H. Blair had title at the date of contract and at the time of his death. Also to ascertain the due proportion of the purchase money, without interest, which should be paid for such part." Respondent, however, saw fit to decline the privilege afforded him of filing a deed for the entire tract within thirty days, and took an appeal to the Supreme Court from the decree made as aforesaid, which Court, after argument, refused to pass upon the errors complained of because the order appealed from was but an interlocutory decree, and sent the case back to the lower court to be proceeded with to final decree and adjudication. In accordance with said decree the record was returned from the Supreme Court, and on the 25th day of June, 1895, the court made the order referring the matter back to the master to ascertain the quantity of land to which the estate could make title and the proportionate part of the purchase money to be paid on account thereof in pursuance of the decree of January 5, 1895, who, after taking testimony, made report on January 3, 1896, finding that the estate could only make title to sixty acres of the land in question, and that the proportionate part of the $5,200 of

purchase money to be paid on account thereof was $1200, and recommended the following decree, to wit:

## "DECREE.

"And now, January 3, 1896, it is ordered, adjudged and decreed that the petitioners, to wit: the Bellefonte Furnace Company, pay into the orphans' court of Centre county the sum of twelve hundred ($1,200) dollars, not to be paid out only upon the written order of the court, and shall be retained by the court until the equities arising out of this contract shall be fully adjusted by the decree of the said court. And further, that the said Frank P. Blair make, execute and deliver to the Bellefonte Furnace Company a deed for all that certain tract of land containing sixty (60) acres, to which the said William H. Blair had title during his lifetime."

To this report both the petitioners and the respondent filed exceptions, which were disposed of by GORDON, P. J. of the 46th judicial district in the following opinion:

The case is now before us for final decree, and the first question to be considered is the extent to which our investigations should go; that is to say, whether we should review the case from the beginning, regardless of the decree of his Honor, Judge FURST, of January 5, 1896, as claimed by the respondent, or consider all matters up to the making of that decree adjudicated so far as the lower court is concerned, as claimed by petitioners. We are of the opinion the latter contention is correct and that the investigation should be confined to the matters submitted to the master on the second reference and to the exceptions filed to his report thereon. We have no right to review the case as presented to the court resulting in the former decree. That is a matter exclusively for the higher court. The appeal heretofore taken was for that purpose. The Supreme Court did not refuse to pass upon the errors complained of, but merely postponed consideration of the same until final decree was made disposing of the case. If the higher court would consent to review each interlocutory decree as made in the progress of a trial, there might be as many appeals as there are steps taken. After the decree in the present issue is made, either party can have the entire case reviewed on appeal, and all errors com-

plained of in the various decrees made during its progress corrected. Being of this opinion, we decline to consider any of the questions involved in the issues heretofore disposed of by the court, and express no opinion whatever thereon. But, assuming the decree of January 5, 1896, is just and correct, will confine our investigation to the issue raised by the exceptions taken to the master's second report, just as if said decree was a final adjudication of the case up to that point, which it will be, unless reversed on appeal by a higher court.

From this the conclusion follows that respondent's first fourteen exceptions, raising questions involved in the prior disposition of the case, must be and they are hereby overruled. The issue is confined to the master's second report. This case was referred back to him "to ascertain the exact quantity of land to which the estate of Gen. W. H. Blair had title at the date of the contract and at the time of his death. Also to ascertain the due proportion of the purchase money, without interest, which should be paid for such part." Before considering the exceptions taken to the master's findings as set forth in his report, we feel it our duty to notice the following points made by the respondent's counsel, on account of which we are asked to grant relief, viz : 1st. That the provision in the first section of the decree limiting the estate to thirty days in which to procure title and file deed is unjust. 2d. That the time for filing deed should be extended, and the decree so modified that the deed filed with the master November 23, 1895, dated November 13, 1895, may be considered as filed in time. And 3d. That the case was improperly sent back to the master, because the emergency upon the happening of which it was to be sent had not arisen—that is to say, it was not "impossible (by reason of inability to obtain title) for the estate of Gen. W. H. Blair to make such conveyance of title as is provided," but on the contrary that it acquired the necessary outstanding title, and refused to file deed, not because of inability to make title, but in order to have the action of the court reviewed on appeal.

In our opinion these points are not well taken. It is sufficient answer to the first to say that if the order limiting the estate to thirty days in which to procure title and file deed is illegal and unjust, the same can be corrected on appeal. To the second, that we are powerless to afford the relief asked.

The decree being regular upon its face, and the term at which it was made having ended, it could not subsequently be modified or changed: Ullery v. Clark, 18 Pa. 148; Mather's Ex'r v. Patterson, 33 Pa. 487; King v. Brooks, 72 Pa. 363. As to the third point, we think the case was properly sent back to the master. This was the only proper way to bring about the final determination of the case. The excuse that the reason the deed was not filed was because of the appeal to the Supreme Court, is not a valid one. The deed was not only not filed within thirty days from the decree as provided therein, but it was delayed till after the expiration of thirty days from the return of the record from the Supreme Court, and until the case had been referred back to the master, and he was proceeding therewith. The deed could have been filed within the limited period upon such terms and conditions as would not only not have prejudiced, but have secured the rights of the estate, notwithstanding the appeal. It could have thus been done as safely as when subsequently filed before the master, or as it could be done now.

Looking at the case as developed by the testimony, we are convinced the conclusion of the court to permit the estate, as proposed by the administrator in his answer, to procure the necessary outstanding title and file deed for the land covered by the contract, with same effect as if the decedent had been vested with the title at the time of making it, was just and right, and it is to be regretted that the administrator did not seize the opportunity thus afforded, of taking advantage of it and of, thereby, reaping the benefit of the portion of the decree made in favor of the estate, by filing deed in compliance with it. At the time of the death of Gen. Blair, the title to a portion of the land agreed by him, by the option contract, to be conveyed, was in Frank P. Blair, his administrator and sole heir at law, and the equitable title to another portion thereof was in William Lytle, who by quitclaim deed, dated November 12, 1895, reconveyed the same to him. But while he was thus permitted, he was not required, as an individual, to join with himself as administrator, in a conveyance, and thereby part with the title to his own as well as the estate's portion of the land, and having elected not to do so must run the risks and take the consequences whatever they may be.

The question remains, what portion of the land contracted to be sold shall, in accordance with the decree of the 5th of January, 1895, be ordered and directed to be conveyed by the administrator by final decree of specific performance. Manifestly it is only that portion thereof which the decedent owned at the time of his death, and which his administrator can be required by a decree of court to convey. As before stated, the first section of the decree authorized the administrator to procure the necessary titles and convey the whole of the land called for in the contract of sale. It was optional with him to do so or not as the interests of the estate might dictate. But not so as to the portion actually owned by the decedent; as to this, a conveyance by the administrator could be enforced by attachment or otherwise, and would not be optional on his part. The second section of the decree was intended to meet the very emergency that arose, to wit: The inability or failure of the estate to thus procure title and convey the entire tract, and provided that in that event the specific performance should be confined to the portion owned by the estate, and that the purchase money to be paid be proportionably reduced. True, as claimed by respondent's counsel, this was only to be done in case it became " impossible " for the estate to convey " by reason of inability to obtain title," and the respondent claims in his answer and evidence such title could be conveyed. But the fact remains such conveyance was not filed as required by decree. The failure to file deed, which was optional, can properly be taken as evidence, either of inability or unwillingness to do so. What portion of the tract then did the decedent own? The decree covers not only what he owned at the time the contract was made, but also what he subsequently acquired. If one agrees to sell land to which he does not have title his subsequent acquisition of title enures to the benefit of his vendee. It is claimed that decedent had arranged orally with William Lytle, to whom he had sold by articles of agreement one hundred and thirty-two acres of the land in question, and with his son, Frank P. Blair, who was the owner of the portion thereof embraced within the lines of the Josiah Lambourne survey, that they should convey to him in case it was necessary in order to comply with the option contract. But, in our opinion, these oral contracts did not vest title in the decedent. No consider-

ation was paid, improvements made, or possession taken in pursuance of them. No such oral contracts were proved as would justify a chancellor in decreeing their specific performance. The decedent could not have enforced them in his lifetime, and his administrator being equally powerless to do so, cannot be required by a specific performance decree to do so.

The evidence does show, however, which the master seems to have overlooked, that by agreement in writing, dated November 14, 1887, the decedent repurchased from William Lytle a portion of the land previously sold him by articles of agreement. The notes of evidence state that it was for sixty-eight acres. The agreement was not produced at the argument, and has become lost or mislaid. The respective attorneys, however, upon their attention being called to it, admit the existence of such agreement; that it was offered in evidence; and in order to avoid the necessity and delay of again sending the case to the master to ascertain the quantity of land owned by the estate in accordance with these views, have agreed that, excluding from the land agreed to be sold by the option contract the balance or portion remaining in William Lytle, after deducting from his purchase the portion sold back to decedent as aforesaid, and the portion included within the lines of the Lambourne warrant, owned by F. P. Blair, there would remain thereof one hundred and two acres and ninety perches, described as in draft hereto attached, with the signatures of said attorneys appended. Inasmuch as William Lytle had but an equitable title to the land purchased by him, the agreement of November 14, 1887, which he evidently refers to in his testimony, and seems to recite in his quitclaim deed of November 12, 1895, would vest in William H. Blair valid and legal title to the portion of the land which it calls for, which is included within the lines of the Blair warrant, the legal title to which remained in William H. Blair, and that for the one hundred and two acres and ninety perches the administrator can now make title.

From this the conclusion follows that the report of the master as to the quantity of land owned by the estate and the proportion of purchase money to be paid therefor, is incorrect. We find from the testimony that, as before stated, the quantity of land owned by the estate is one hundred and two acres and ninety perches (a specific description of which will be found

in the decree hereto appended), and basing the value of the entire tract of two hundred and seventy acres and one hundred and thirteen perches at $5,200, calculate and fix its value, or proportionate part of purchase money to be paid by petitioners therefor (without interest, as provided in the decree), at the sum of $1,974.

But one question remains to be considered, which is the objection made by petitioners on account of the fact that the premises agreed to be conveyed being bound by the lien of a mortgage entered prior to the making of the option contract, title under this proceeding cannot be made clear of that incumbrance. We overrule this exception for two reasons : 1st. Because from the fact that we find that the purchase money to be paid is $2,562, instead of $1,200, as fixed by the master, the objection may be removed by the application of the same to the incumbrance. And 2nd. If not thus removed, we do not think petitioners can raise the question, for the reason that they are the applicants for the decree of specific performance. As we have hereinbefore explained, petitioners are entitled to receive under this proceeding all the title held by the decedent at the making of the option contract and which he subsequently acquired. The administrator cannot be required to make that title good. When it was found that the estate could not make a good title, clear of incumbrances, to petitioners, they had the right to elect to either accept the title to the extent that it could be made, as they did, or to rescind the contract and seek a remedy for its breach. But having elected to accept under the contract, they must take title in the best and most complete form in which it is possible for the administrator to give it to them. We are not informed as to the condition of the estate, whether solvent or not. Petitioners cannot demand of the respondent that which he cannot give them as administrator. But if they cannot be protected by the application of the purchase money under the order of the court, if there be any other remedy, by subrogation or otherwise, it will be their right and privilege to seek it.

To the extent that the foregoing views are in line with and responsive to the various exceptions, we sustain the same, and so far as in opposition thereto overrule them, without considering them in detail. And note an exception both to petitioners and respondent.

DECREE.

Therefore now, March 27, 1896, in accordance with the foregoing opinion, it is ordered, adjudged and decreed as follows, viz:

1. That within five days from the filing hereof said Frank P. Blair, administrator of William H. Blair, deceased, shall execute and file in the orphans' court of Centre county a good and sufficient deed conveying to the petitioners, the Bellefonte Furnace Company, their successors and assigns, in fee simple, all that certain tract or piece of land situate in Half Moon township, Centre county, Pa., bounded and described as follows, viz: Beginning at the north corner thereof, thence by land of Mattern brothers south forty-one degrees and fifteen minutes east one hundred and seventy-three and five tenths perches to post, thence by land formerly of William Lytle, now of F. P. Blair, south fifty-one degrees west one hundred perches to post, thence by line of Josiah Lambourne warrant, owned by F. P. Blair, north fifty-one degrees and fifteen minutes west one hundred and seventy-three and five-tenths perches to post, thence by land of S. T. Gray north fifty-one degrees east eighty-nine and twenty-five one hundredth perches to place of beginning, containing one hundred and two acres and ninety perches. Said conveyance to be made excepting, reserving and subject to all the rights and privileges mentioned and reserved to William H. Blair, his heirs and assigns, in the said option contract of August 18, 1887, entered into and given by him to the said Bellefonte Furnace Company, excepting the sum of money for which said furnace company shall be reimbursed shall be the said sum of $1,974 instead of $5,200, as therein provided. Deed to be delivered to petitioners only upon the order of said court.

2. That within five days from notice of the filing of said deed the Bellefonte Furnace Company, the petitioners, shall pay into the said orphans' court of Centre county the sum of $1,974, without liability to costs or poundage, subject to the order of court, the same to be retained until the incumbrances upon the premises in question are removed, and the equities arising out of the contract in question shall be fully adjusted by the court. Said money to be subject to the order of the court, and appropriated or paid out only upon its order, after notice to parties interested and hearing had.

3. Nothing herein contained shall be taken or construed as in any manner taking from the said Bellefonte Furnace Company, their successors or assigns, as grantees in said option contract, or as affecting, any right of action at law or in equity, which they may have for or on account of any breach thereof, as set forth in the decree of January 5, 1895.

4. As provided in the said decree, all costs, including master's fees, incurred subsequent thereto, shall be paid by the estate of W. H. Blair, deceased.

Frank P. Blair, administrator and heir at law of Gen. Wm. H. Blair, appealed from this decree.

*Error assigned* among others was decree of the court.

*Ellis L. Orvis* and *Samuel Gustine Thompson*, with them *Calvin M. Bower*, for appellant.—If an option is given, which is to be accepted by payment within a given time, then the time of payment is certainly essential; in fact, payment is a condition precedent to the vesting of any right in the vendee : Pomeroy on Contracts, sec. 387 ; Westerman v. Means, 12 Pa. 97 ; Fessler's App., 75 Pa. 483.

If specific performance be directed it should be for all the land described in the contract and not for one hundred and two acres and ninety perches only.

A much stronger suit is required to maintain than to decline specific performance : Datz v. Phillips, 137 Pa. 203 ; Foster's Est., 23 W. N. C. 271; Porter v. Dougherty, 25 Pa. 405; Jones v. Jones, 11 Phila. 559; Geissler v. Scott, 13 Leg. Int. 212; Walsh's Est., 4 Kulp, 178; Irvin v. Bleakley, 67 Pa. 24.

Equity may enforce specific performance of contract though vendor had no title at the time of sale if he can make a good title at time of decree : Mason v. Caldwell, 48 Am. Dec. 330 ; Seymour v. Delancy, 15 Am. Dec. 270; Convers v. Vanatta, 24 Pa. 257; Townsend v. Lewis, 35 Pa. 125; Ley v. Huber, 3 Watts, 367; Gans v. Renshaw, 2 Pa. 34.

Admitting, for argument, that decedent was in fault, that even a good legal tender was made of the purchase money, we still maintain that decedent's estate is entitled to interest from the time appellee went into exclusive occupation of the land :

Pomeroy on Contracts, Specific Performance sec. 428; Smith v. Byres, 152 Mass. 144.

All the costs should be placed upon appellee.

*John M. Dale*, for appellee.—Where a misrepresentation is made as to quantity, though innocently, the purchaser is entitled to have what the vendor can give, with an abatement out of the purchase money for so much as the quantity falls short of the representation: Hill v. Buckley, 17 Ves. 394; Erwin v. Myers, 46 Pa. 96.

A court of equity ought not to decree specific performance of a contract to the letter, where from change of circumstances, mistake or misapprehension, it would be unconscientious so to do. The court may so modify the agreement as to do justice as far as circumstances will permit, and refuse specific execution unless the party seeking it will comply with such modifications as justice requires: Mechanics' Bank of Alexandria v. Lynn, 26 U. S. 374.

Opinion by Mr. Justice McCollum, January 4, 1897:

The offer of August 18, 1887, was accepted by the Furnace Company the next day at its office in Philadelphia. Formal notice of the acceptance was not given to Gen. Blair, or to any one representing him, but the company promptly took possession of the land described in the offer, and made valuable improvements thereon. It has had possession of the land upwards of nine years, and during that time has taken from it ore and timber sufficient at least to pay the purchase money, but it has not complied with any of the terms of the offer it accepted and under which the possession was obtained. Gen. Blair died in December, 1888, and his only son and heir, Frank P. Blair, became administrator of his estate. Failing to obtain a settlement with the company he brought an action of ejectment against it in April, 1889, in which he secured a verdict for the land on the 5th of May, 1891. The court ordered a suspension of judgment on the verdict pending proceedings in the orphans' court for specific performance of the contract founded upon the offer and acceptance above mentioned, and that the company commence such proceedings within sixty days and prosecute them to final hearing within six months unless the time was

enlarged for cause shown. This order was made on the day the verdict was rendered, but the company ignored it and did not file a petition for specific performance until the 28th of August, 1893, more than twenty-five months after the time allowed for filing it had expired. The answer to the petition was filed on the 2d of October, 1893, and on the 27th of November, 1893, Clement Dale, Esq., was appointed examiner and master to take testimony "report the facts to the court and suggest decree," etc. From the testimony taken on the hearing before him the learned master found that the land which Gen. Blair pointed out and proposed to sell to the company was correctly described in the offer, and that he was prepared to make a deed for the same to the purchaser. He also found that Frank P. Blair was able to carry out the contract the company made with his father. The findings we have referred to were against the contention of the company respecting the matters included in them. They were approved by the court and their accuracy is no longer questioned. The master filed his report on the 6th of December, 1894, and it recommended a decree requiring Frank P. Blair within thirty days from the filing thereof to make, execute and deliver to the company, a deed for the land; and requiring the company, within ten days from the receipt of notice that the deed was prepared and ready for delivery, to pay the purchase money without interest. Exceptions were filed to the report, and the learned judge who heard argument upon and dismissed them entered on the 5th of January, 1895, what he called "a preliminary decree." It contained all the provisions of the decree recommended by the master, and added to them the further provision that if it should be impossible for the estate of Gen. Blair (by reason of inability to obtain title) to make the deed within the time designated in the first section of the decree, the case should be referred back to the master to ascertain the exact quantity of land Gen. Blair had title to "at the date of contract and at the time of his death," and "the due proportion of the purchase money, without interest, which should be paid for such part." An appeal was taken from the decree to this court where it was quashed on the ground that it was premature.

The deed was not filed within the time designated in the "preliminary decree," but it was executed on the 13th of Novem-

ber, 1895, presented to and "identified" by the master on the 23d and filed on the 30th of the same month. The only objection made to the deed was that it was not filed within the time fixed by the decree, and, because it was not filed within that time, the learned master and the learned judge who passed upon the exceptions to his supplemental report concluded that the final decree for specific performance must be limited to such part of the land included in the offer of August 18, 1887, as Gen. Blair had title to at the date of said offer, "and at the time of his death." The former found that he had title to sixty acres, and the latter found that he had title to one hundred and two acres and ninety perches. A decree was accordingly entered March 27, 1896, requiring Frank P. Blair, admr. etc. to convey said one hundred and two acres and ninety perches of said land to the furnace company, and the furnace company to pay therefor $1,974, that being the proportion of purchase money applicable to it. The case is now before us on appeal from this decree.

The learned judge who entered the "preliminary decree" did not have sufficient opportunity to consider the case. His consciousness of the want of it appeared in his opinion. He heard the argument on exceptions to the master's report on Friday and entered the decree the next day, that being the last secular day of his official term. His successor in office having had charge of the case for the company could make no order in it, and it therefore became necessary to summon a judge from another district to hear and finally dispose of it. This was not done until November, 1895. The appeal from the "preliminary decree" was quashed in April, and the record returned in June of that year. These circumstances furnished sufficient ground for extending the time for filing the deed. The mere pendency of a motion or rule for a new trial in the ejectment case was deemed sufficient to justify the court in allowing the furnace company an additional sixty days in which to file its petition for specific performance. This extension was granted twenty-five months after the time allowed for filing it by the order of May 5, 1891 had expired, and the petition when presented showed upon its face that it was prepared, signed and sworn to by the superintendent of the company on the 12th of June, 1891. It is apparent that great injustice will be done to

the appellant by a strict enforcement of the provision in the "preliminary decree" in regard to the time allowed for filing the deed, and no equitable considerations appear to support or demand it. We think, therefore, that under the circumstances and having regard to the equities of the case, the learned judge who entered the final decree should have allowed the deed of November 13, 1895, the effect it would have been entitled to if it had been filed within the time named in the preliminary decree. This was within the equity powers of the court and a proper case was presented for the exercise of them.

The learned master in his first report recommended specific performance and payment of purchase money without interest. The learned judge who entered the first decree adopted the recommendation of the master and added to the decree the stipulation we have already considered. The former did not state why he refused to allow interest on the purchase money, but the latter put his refusal to allow it on the ground that the company had shown a readiness to perform and pay in 1887, and that Gen. Blair was entitled under the contract to an undivided one half interest in the iron ore, surface, timber, etc., remaining unsold after the company had realized a certain sum in the manner stated therein. For these reasons he thought it would be unjust to require the company to pay interest. We cannot see how the provision in the contract in regard to the interest of Gen. Blair in certain iron ore, timber, etc. affects his right to interest on the purchase money, nor can we discover in the action of the company in respect to performance anything which ought in equity to relieve it from the payment of the same. The purchase money was due October 17, 1887, but no payment or legal tender of it was ever made. It is true that Thos. Collins, one of the company's stockholders, testified that he told Blair he was prepared to pay it, and that the company wanted to close the deal so it could include the land in a mortgage it proposed to issue on its property. It appears that the mortgage referred to was for $100,000, and that Gen. Blair objected to the inclusion of the land in it because it might interfere with the enjoyment of his residuary interest, but he did not refuse to make a deed in accordance with the contract. He tendered a deed in the spring of 1888, which the company declined to accept because the description was not sufficiently

specific and it contained a covenant which might lead to complications. It is proper to state in this connection that the company alleged in its petition for specific performance, as further reason for refusing to accept the deed, that it did not include all the land which Gen. Blair pointed out as within the boundaries mentioned in his offer of August 18, 1887. This is important as showing by the company's own confession that it was not ready and willing in the spring of 1888 to accept performance of the contract as written, or to pay for the land described in it the purchase money called for by it. While the company petitioned for specific performance, it did so under an order of court, and reluctantly, and then sought to modify the contract so as to reduce its liability upon it.

We have carefully examined and considered the evidence in the case and the claims of the parties, and our conclusion is that a decree should be entered requiring Frank P. Blair, admr. etc., to file in the orphans' court a good and sufficient deed (if he has not already filed it there) conveying to the furnace company its successors and assigns, in fee simple, the land described in the contract, and the furnace company to pay into said court the sum of $5,200, together with interest thereon from October 17, 1887 ; the deed to be delivered to the furnace company and the money to be paid to Frank P. Blair, admr. etc., only upon the order of said court and after the incumbrances upon the premises conveyed have been removed. The deed to be made subject to the rights reserved to Blair, his heirs, etc., in the offer of August 18, 1887. We think also that as neither party was exclusively responsible for the delays in the adjustment of their differences the costs should be equally divided between them. To the extent that this opinion is in conflict with the rulings of the court below, the specifications are sustained.

Decree reversed and record remitted, with direction to enter a decree in accordance with this opinion. The costs of the appeal to be equally divided between the parties.